**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JESSICA TORRES, o/b/o, J.M.C.,**

        **Plaintiff,**

-vs-                                                    **Case No. 6:04-cv-709-Orl-KRS**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

        **Defendant.**

_____

**ORDER**

This cause came on for consideration without oral argument on the complaint filed by Jessica Torres on behalf of her minor daughter, Jesselyn, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security disability benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration (SSA). Doc. No. 9. This matter has been referred to me under 28 U.S.C. § 636(c) pursuant to the consent of the parties. Doc. Nos. 11, 12.

**I.     PROCEDURAL HISTORY.**

On November 2, 2001, Torres filed an application for disability benefits under the Supplemental Security Income for the Aged, Blind, and Disabled Program (SSI), 42 U.S.C. § 1382, *et seq.*, alleging that Jesselyn was disabled as of October 18, 2001. TR. 77-80. Torres' claim was denied initially and upon reconsideration. TR. 65-66, 70-72.

Torres requested a hearing before an administrative law judge (ALJ), TR. 73, which was held on October 8, 2003, TR. 24-55. Torres was not represented by counsel at the hearing. The notice of the right to request a hearing advised Torres that she could have someone represent her at the hearing, but it did not advise Torres that the fees paid by the attorney would be limited to no more than 25% of any past-due benefits awarded. TR. 72; *see also* TR. 66. In response to questions posed by the ALJ, Torres stated that she waived her right to counsel at the hearing. TR. 28; *accord* TR. 64. Torres, Jesselyn, and an additional witness, Efrain Mijon, testified at the hearing. TR. 24-55.

After considering the testimony and the medical evidence presented, the ALJ found that Jesselyn had not engaged in any substantial gainful activity since October 18, 2001, the alleged onset date of her disability. TR. 11. The ALJ concluded that Jesselyn had the impairments of speech/language delay, episodic nervous shaking, partial seizures (controlled with medication), thalassemia,[1] and bronchitis. TR. 17. The ALJ found that these impairments caused more than minimal limitations in age-appropriate functions and that, therefore, they were severe under the SSA's regulations. TR. 11. However, the ALJ found that Jesselyn's impairments did not meet or equal the criteria of any impairments listed at 20 C.F.R. Part 404, Appendix 1, Subpart P, Regulation 4, and, therefore, she was not disabled. TR. 11.

---

[1] Thalassemia is "[n]ot just one disease but rather a complex series of genetic (inherited) disorders all of which involve underproduction of hemoglobin, the indispensable molecule in red blood cells that carries oxygen. . . . In thalassemia, there is a mutation (change) in one of the types of globin chains. Depending upon which globin chain is affected, the mutation typically leads to underproduction (or absence) of that globin chain, a deficiency of hemoglobin, and anemia." MEDICINENET.COM, www.medterms.com/script/main/art.asp?articlekey=5750 (last visited Sept. 12, 2005).

The ALJ evaluated the functional equivalence of Jesselyn's impairments under six domains and found that she had a less-than-moderate degree of limitation in the following: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for herself; and (6) in health and physical well-being.  TR. 16-17; *See* 20 C.F.R. § 416.926a(b)(1).  In support of each domain finding, the ALJ cited the evidence supporting his findings.  In addition, the ALJ found that Torres' allegations concerning her daughter's impairments and resulting functional limitations were exaggerated and not completely credible.  TR. 13-14.

Torres requested review of the ALJ's decision by the Appeals Council.  TR. 5.  On April 28, 2004, the Appeals Council denied Torres' request for review.  TR. 2-4.  Torres timely appealed this decision in this Court. Doc. No. 1.

## II.   JURISDICTION.

The Commissioner of the SSA issued a final decision after a hearing with respect to Torres' application for disability benefits under SSI.  Therefore, the Court has jurisdiction over this matter under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.   STATEMENT OF FACTS.

A.   *Testimony of Torres, Jesselyn, and Mijon.*

Jesselyn, who was born on May 3, 1999, was four years old at the time of the hearing.  TR. 36.  Torres testified that Jesselyn had some sort of "epilepsy seizure" disorder before she was born. TR. 36.  Torres also had epilepsy, which was controlled by medication.  TR. 36-37.  Jesselyn would get "shakes" for spells of two to four minutes and frequent headaches.  TR. 38, 44.  Jesselyn

took Trileptal[2] for her condition, which helped to relieve her symptoms; Jesselyn had not had a shaking spell during the month before the hearing. TR. 38, 49. When Jesselyn got headaches, lights bothered her. TR. 38. Jesselyn frequently got colds and diarrhea as well. TR. 41-43. Jesselyn also had polycythemia.[3] TR. 51. She cried frequently. TR. 45. In addition, Jesselyn's sleeping patterns were erratic. TR. 38-39

Torres testified that Jesselyn usually ate breakfast, and ate only small amounts of food at other times. TR. 39-40. Sometimes Jesselyn ate "Play-Doh" or paper. TR. 43; *see also* TR. 148.

Torres testified that Jesselyn spoke both English and Spanish, but that she would not speak in full sentences. TR. 41. Torres purchased computer learning games to help Jesselyn, and had Jesselyn in both behavioral and speech therapy. TR. TR. 45-46.

Jesselyn testified that she was four years old. TR. 30. Jesselyn liked school, and her favorite game to play at school was "A is for alligator." TR. 30-31. She testified that she ate three meals per day. TR. 31. She lived with her mother, father, sister, and grandparents. TR. 32-33, 39. She testified that her sister was her best friend. TR. 34.[4] Torres testified, however, that Jesselyn and her sister would often fight. TR. 47. Torres also testified that Jesselyn liked to put on make-up, play dress-up, and play on the computer. TR. 47-48.

---

[2] Trileptal is used alone or in combination with other medications to treat certain types of seizures in the treatment of epilepsy. *See* MEDLINE PLUS, www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601245.html (last visited Sept. 12, 2005).

[3] Polycythemia is "[a]n increase above the normal in the number of red cells in the blood." STEDMAN'S MEDICAL DICTIONARY 1402 (26th ed. 1995).

[4] It appears that Jesselyn nodded or shook her head or pointed in response to some of the ALJ's questions. *See, e.g.,* TR. 34 (ALJ: "She nodded her head yes on that."); TR. 35 (ALJ: "You're pointing to your mother. All right.").

Efrain Mijon, Jesselyn's grandfather, was the final witness. TR. 53. He testified that Jesselyn had difficulty eating, and that she was frequently visiting the doctor due to headaches or ear and throat infections. TR. 54. He also said that Jesslyn had difficulty comprehending things. TR. 54. In response to a written questionnaire, Jesselyn's aunt, Maria S. Padro, wrote in December 2001 that Jesselyn needed constant monitoring. She was very active and always acted as though she did not understand what someone was telling her. Padro also wrote that she could not understand what Jesselyn said. TR. 105-06.

B.    *Medical and School Records.*

Medical records indicate that Jesselyn was growing normally through her second birthday. TR. 128-29. Medical records from December 2000 and January 2001 indicate that Robert J. Cooper, M.D., treated Jesselyn for an ear infection, which resolved. TR. 120-21.

On December 20, 2001, Jesselyn was evaluated by speech therapists Linda Riley and Ana Lia Oliva. TR. 138-39. On the Preschool Languages Scales – 3 (Spanish/English) test, Jesselyn scored in the 30th percentile in auditory comprehension, the 18th percentile in expressive communication, and the 21st percentile in total language, which placed Jesselyn in the age-equivalency range of two to four or five years old. TR. 138. These results were within normal limits. TR. 138. The therapists were unable to evaluate Jesselyn's articulation, voice, and fluency due to the lack of verbal responses. The therapists noted that Jesselyn was not able "to combine 3 words in spontaneous speech, use plurals, answer 'wh' and yes/no questions, and produce basic sentences." TR. 138. The therapists concluded that Jesselyn's pragmatic skills were significantly

delayed. TR. 138. Their assessment was that Jesselyn appeared to have a moderate expressive language disorder, and her overall language skills were mildly delayed. TR. 139.

A February 27, 2002, audiological evaluation indicated that Jesselyn had normal hearing. TR. 152. A February 27, 2002, developmental evaluation indicated that Jesselyn was delayed in her expressive language capabilities. TR. 150.

The Orange County Public Schools administered tests to Jesselyn in April 2002. On a Differential Ability Scales (DAS) – Lower Preschool test, Jesselyn's scores ranged from the 50th to 73rd percentile. Silvia Hurtado de Mendoza, Ed.S., the school psychologist, wrote that this cognitive score was in the average range. TR. 189. Other tests showed severe limitations in several areas. TR. 195. A Battelle Development Inventory placed Jesselyn below the standard score in the following domains: personal-social; receptive and expressive language; and cognitive. The overall score was slightly (-0.28) below the standard score. TR. 197. Enid E. Torres, M.A.S.P., concluded that Jesselyn's communication skills interfered with her ability to benefit from school. She recommended that Jesselyn receive both articulation and language therapy. TR. 196.

A school report, dated April 24, 2002, reflects that Jesselyn qualified for the Speech-Language Impaired program. TR. 179. On May 17, 2002, Enid Torres wrote that Jesselyn "has difficulty on understanding verbal information, especially when answering questions. She responds with Yes to all of the questions and statements that are said to her without cues. She also has a limited vocabulary. She only combines one to two words together; She rarely combines three words. She demonstrated distorted speech." TR. 193.

Subsequent school progress reports in April 2003 reflect that Jesselyn was making progress in all areas. TR. 167. Jesselyn was "able to follow 3-step directions related to the daily routine, label the 10 basic colors and sort by color and size, count to 9 consistently, answer simple yes/no and 'Wh' questions, and combine 3 words together to communicate." TR. 173. However, she was not able "to share/take turns independently with peers, use multisyllabic words (3 or more syllables) while speaking, identify/use descriptive spatial and linguistic concepts, identify/use developmentally appropriate vocabulary, identify/describe the functions of objects, and produce grammatically correct sentences . . . ." *Id.* Jesselyn was enrolled in a full-day program in Self-Contained Language to begin after the normal school year ended. TR. 175.

A March 6, 2003, blood test ordered by Dr. Raymond R. Caron revealed that Jesselyn had possible thalassemia. TR. 163.

On June 9, 2003, Ron Davis, M.D., a child neurologist, examined Jesselyn at the request of Dr. Caron. In his letter to Dr. Caron, Dr. Davis summarized Jesselyn's symptoms as follows: "As you well know, she is a 4-year-old who has been having headaches and vertigo, as well as episodes of nervous shaking. These occur in conjunction with the headaches. It lasts for a number of minutes. It has been occurring fairly frequently." TR. 164. Dr. Davis observed that Jesselyn was able to follow directions appropriately. TR. 164. However, the results of an EEG were abnormal. TR. 165. Dr. Davis prescribed Trileptal and Diastat[5] for any "breakthrough spells." TR. 165.

---

[5] Diastat is used to relieve anxiety, nervousness, and tension associated with anxiety disorders. Drugs.com *at* http://www.drugs.com/mtm/d/diastat.html (last visited Sept. 12, 2005).

      C.     *Reviewing Physicians' Opinions.*

On January 8, 2002, Grena Wang, M.D.,[6] completed a childhood disability evaluation form regarding Jesselyn. TR. 140-45. Dr. Wang opined that Jesselyn had a speech impairment and moderate expressive language disorder, which constituted a severe combination of impairments, but did not meet or equal a listed impairment under the SSA's regulations. TR. 140. Dr. Wang opined that Jesselyn would have a "less than marked" limitation with respect to attending and completing tasks and interacting and relating with others. TR. 142.

On February 5, 2002, Carole J. Hardiman, M.S., completed an evaluation of Jesselyn's speech impairment based on a review of her medical records. TR. 146. Hardiman concluded that the evidence supported a less-than-marked degree of limitation in communication as it pertained to the third domain, regarding interacting and relating with others. TR. 146.

On May 15, 2002, Debra M. Ashcraft, M.D.,[7] completed a childhood disability evaluation form regarding Jesselyn. TR. 153-59. Dr. Ashcraft's conclusions were the same as those of Dr. Wang, with the addition that Jesselyn would have a less-than-marked limitation in the domain of acquiring and using information. TR. 156. In addition, Rhonda Gaudino, M.S., verified Dr. Ashcraft's opinion with respect to the impact of Jesselyn's speech impairment on the third domain. TR. 160.

---

[6] Dr. Wang signed the evaluation form on January 8, 2002, as the "Consultant with overall responsibility." TR. 141. The signature of Deborah L. Carter, Ph.D., dated January 23, 2002, also appears on the form as "Additional consultant." TR. 141.

[7] Like the previous evaluation, Dr. Ashcraft signed this form as the responsible consultant, and Jeffrey L. Prickett, Psy.D., signed the form as an additional consultant. TR. 154.

**IV.     STANDARD OF REVIEW.**

The process for determining whether a child is disabled "begins with the ALJ determining whether the child is 'doing substantial gainful activity,' in which case [the child] is considered 'not disabled' and is ineligible for benefits. 20 C.F.R. §§ 416.924(a), (b)." *Shinn ex. rel Shinn v. Comm'r*, 391 F.3d 1276 1278 (11th Cir. 2004). "The next step is for the ALJ to consider the child's 'physical or mental impairment(s)' to determine if [the child] has 'an impairment or combination of impairments that is severe.' [20 C.F.R.] § 416.924(a), (c)." *Id.* A "physical or mental impairment" under the terms of the Act is one that results "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 416.908.

If the child has a severe impairment, "the ALJ next assesses whether the impairment 'causes marked and severe functional limitations' for the child. 20 C.F.R. §§ 416.911(b), 416.924(d). Limitations arising from pain count in this determination. *Id.* § 416.924(a)." *Shinn*, 391 F.3d at 1278. The impairment "must 'be expected to cause death or . . . last for a continuous period of not less than 12 months.' 20 C.F.R. § 416.906; *see also id.* § 4316.909." *Shinn*, 391 F.3d at 1279.

"A child's impairment is recognized as causing 'marked and severe functional limitations' if those limitations' meet[ ], medically equal[ ], or functionally equal[ ] the [L]istings.' [20 C.F.R.] § 416.911(b)(1); *see also* §§ 416.902, 416.924(a)." *Shinn*, 391 F.3d at 1278. "Limitations appearing in these listings are considered 'marked and severe.' *Id.*" *Shinn*, 391 F.3d at 1278.

If the child's impairments do not meet or equal a listed impairment, the ALJ can still conclude that the child's impairments are functionally equivalent to those in the Listings. "In making this determination, the ALJ assesses the degree to which the child's limitations interfere with the child's normal life activities." *Shinn*, 391 F.2d at 1279. The Code of Federal Regulations specifies six major domains of life that the ALJ should consider, namely: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). The Regulations further provide benchmarks that children should have achieved by certain ages.

"A child's impairment is 'of listing-level severity,' and so 'functionally equals the listings,' if as a result of the limitations stemming from that impairment the child has 'marked limitations in two of the domains . . . , or an extreme limitation in one domain.' [20 C.F.R.] § 416.926a; *see also* [20 C.F.R.] § 416.925." *Shinn*, 391 F.3d at 1279.

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987) (quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision. *Id.* While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

## V.   ANALYSIS.

On appeal to this Court, Torres argues that because she was not represented by counsel, the ALJ had a "special duty" to fully develop the record. She contends that the ALJ breached this duty by failing to obtain medical records regarding thalassemia, and by failing to seek a consulting evaluation of Jesselyn's eating disorder and behavioral problems. She also asserts that the ALJ's findings that Jesselyn's limitations arising from her speech and communication difficulties were less than moderate were not supported by substantial evidence in the record. Finally, she submits that the ALJ's finding that her seizure disorder was controlled by medication and that neurological examinations were unremarkable is an incorrect reading of the record. These are the only issues I will address.

When a claimant is not represented by counsel, and does not effectively waive the right to be represented, the ALJ has a special duty to develop the record fully. *See Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995). As a matter of law, Torres did not effectively waive her right to be represented because the record does not reflect that she was informed that a lawyer could not obtain as attorney's fees more than 25% of any past-due benefits awarded. *See Edwards v. Sullivan*, 937 F.2d 580, 585 (11th Cir. 1991).

The Commissioner correctly responds that even in the event of an ineffective waiver of counsel, the ALJ's failure to gather the missing treatment records does not require reversal unless failure to do so would result in unfairness or clear prejudice. *See Brown*, 44 F.3d at 935. However, the Court is not required to find that violation of the special duty to develop the record "'would necessarily have resulted in any specific benefits in the handling of the case before the ALJ.'" *Id*. (quoting *Clark v. Schweiker*, 652 F.2d 399, 404 (5th Cir. Unit B July 17, 1981)). Therefore, the initial question before the Court is whether the ALJ's failure to seek further records or order consultative examinations resulted in unfairness or clear prejudice to Torres and Jesselyn.

In disability reports, Torres wrote that Jesselyn had been treated by Raymond F. Caron. TR. 91, 117. The report written by Dr. Davis indicates that Jesselyn was referred to him by Dr. Caron, which provides further support for the conclusion that Dr. Caron was one of Jesselyn's treating physicians. It appears that Dr. Caron referred Jesselyn to Dr. Davis for evaluation of her headaches, vertigo and nervous shaking. It is reasonable to infer, therefore, that Dr. Caron's records of treatment of Jesselyn might address her complaints of headaches, vertigo, and nervous shaking, and provide some insight as to the severity of those conditions. The record includes blood tests ordered by Dr. Caron, but I have been unable to find, and the parties do not cite to other records of his treatment of Jesselyn.

The record also reflects that Jesselyn received both behavioral and speech therapy. Torres provided the names and/or telephone numbers of these therapists in a written report. TR. 117. I find no documents in the record from these therapists, nor any attempt to contact them to obtain information.

The Eleventh Circuit recognizes that "[t]he lack of medical . . . documentation supporting an applicant's allegations of disability is undoubtedly prejudicial to a claim for benefits." *See Brown*, 44 F.3d 935-36. Here, the missing evidence appears to be from one of the physicians and two of the therapists who examined, treated, or provided therapy to Jesselyn for the conditions that her mother contends qualify Jesselyn for SSI benefits. Because the medical records are so sparse with respect to Jesselyn's complaints of, and treatment for, headaches, shaking, and vertigo, it is difficult to evaluate how severe these impairments were before her doctors prescribed medication shortly before the hearing that alleviated at least some of these conditions. Accordingly, I find that Torres and Jesselyn were prejudiced by the ALJ's failure to gather all records from her treating physicians and therapists or to establish that such records do not exist. Under these circumstances, remand for further proceedings is required.

## VI.     CONCLUSION.

It is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings. The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida this 14th day of September, 2005.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties